IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON DIVISION

CURTIS B. DUNCAN, et al,

        Plaintiffs,

v.                                  CIVIL ACTION NO.  2:23-cv-00780

RIVERSIDE HEALTH AND REHABILITATION LLC, et al.,

        Defendants.

**MEMORANDUM OPINION AND ORDER**

Pending before the Court is Defendants Riverside Health and Rehabilitation, LLC, d/b/a Riverside Health and Rehabilitation; Medical Rehabilitation Centers, LLC, d/b/a Exceptional Living Centers; and Exceptional Living Tenant 1, LLC's (collectively, "Defendants") Motion to Compel Arbitration and Motion to Dismiss the Complaint. (ECF No. 2.) For the reasons below, the motion is **DENIED**.

I.    BACKGROUND

On October 20, 2023, Plaintiff Curtis Duncan ("Plaintiff"), Executor of the Estate of James E. Duncan, initiated this action by filing a complaint against Defendants in the Circuit Court of Kanawha County, West Virginia. (ECF No. 1-1.) According to the complaint, beginning on June 17, 2022, James Duncan was a resident of a nursing home operated by Defendants. (*Id.* at 4, ¶¶ 12–14.) The complaint alleges that while under Defendants' care, James Duncan developed an infection of a sacral decubitus ulcer, which ultimately led to his death. (*Id.* at 6, ¶ 21.)

1

While James Duncan was alive, a document was executed designating his daughter, Bonnie Schulz, as his medical surrogate. (ECF Nos. 2-2; 7-1.)[1] Ms. Schulz then signed an arbitration agreement on James Duncan's behalf. (*Id.*) The issue in this case is whether Ms. Schulz, acting as James Duncan's medical surrogate, had the authority to bind him to arbitration.

Defendants removed the case to this Court on December 6, 2023, pursuant to 28 U.S.C. § 1332(a)(1). (ECF No. 1.) Then, Defendants filed this motion to compel arbitration and motion to dismiss on December 6, 2023. (ECF No. 2.) Plaintiff responded to Defendants' motion on December 20, 2023, (ECF No. 8), and Defendants filed their reply on December 27, 2023 (ECF No. 11). Thus, the motion is fully briefed and ripe for adjudication.

## II.      LEGAL STANDARD

Section 2 of the Federal Arbitration Act ("FAA") "is the primary substantive provision of the Act." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983). Section 2 provides that written agreements to arbitrate controversies arising out of an existing contract "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. Enacted "to reverse the longstanding judicial hostility to arbitration agreements," *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 24 (1991), § 2 thus "places arbitration agreements on equal footing with all other contracts," *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 443 (2006), by "requir[ing] courts to enforce arbitration agreements according to their terms." *Lamps Plus, Inc. v. Varela*, 139 S. Ct. 1407,

---

[1] The Court takes into consideration this attached agreement, which is material outside of the pleadings. Therefore, for reasons explained more fully below, this motion shall be treated as one for summary judgment provided in Federal Rules of Civil Procedure Rule 56.

2

1415, 203 L. Ed. 2d 636 (2019) (internal quotation marks omitted) (quoting *Epic Sys. Corp. v. Lewis*, 584 U.S. —, 138 S. Ct. 1612, 1621, 200 L. Ed. 2d 889 (2018)).

Courts have long interpreted the FAA as "reflect[ing] 'a liberal federal policy favoring arbitration agreements.'" *Adkins v. Labor Ready, Inc.*, 303 F.3d 496, 500 (4th Cir. 2002) (quoting *Moses H. Cone*, 460 U.S. at 24); *see, e.g.*, *Am. Recovery Corp. v. Computerized Thermal Imaging, Inc.*, 96 F.3d 88, 92 (4th Cir. 1996) ("[T]he Supreme Court has announced its healthy regard for the federal policy favoring arbitration.") (internal quotation marks omitted). Thus, although courts now enforce arbitration agreements "accord[ing] [to] their terms," *Volt Info. Scis., Inc. v. Bd. of Trs. of Leland Stanford Junior Univ.*, 489 U.S. 468, 478 (1989), "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Mey v. DIRECTV, LLC*, 971 F.3d 284, 292 (4th Cir. 2020) (quoting *Moses H. Cone*, 460 U.S. at 24–25).

Section 3 entitles "litigants already in federal court to invoke [arbitration] agreements made enforceable by § 2." *Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 630 (2009). Litigants do so by moving the Court "to stay judicial proceedings involving issues covered by written arbitration agreements." *Choice Hotels Int'l, Inc. v. BSR Tropicana Resort, Inc.*, 252 F.3d 707, 709 (4th Cir. 2001). Section 3 thus requires courts "to grant a motion to compel arbitration where a valid arbitration agreement exists and the issues in a case fall within its purview." *Adkins*, 303 F.3d at 500. In other words, the "stay-of-litigation provision is mandatory." *Id.* Litigants wishing to compel arbitration under the FAA must prove

> (1) the existence of a dispute between the parties, (2) a written agreement that includes an arbitration provision which purports to cover the dispute, (3) the relationship of the transaction, which is evidenced by the agreement, to interstate or foreign commerce, and (4) the failure, neglect or refusal of the defendant to arbitrate the dispute.

*Adkins*, 303 F.3d at 500–01 (quoting *Whiteside v. Teltech Corp.*, 940 F.2d 99, 102 (4th Cir. 1991)).

To determine if an arbitration clause is valid, courts look to the contract formation law of the forum state. *Cara's Notions, Inc. v. Hallmark Cards, Inc.*, 140 F.3d 566, 569 (4th Cir. 1998). Once the arbitration clause is deemed valid, the breadth and scope of the clause are governed by the "federal substantive law of arbitrability." *Int'l Paper Co. v. Schwabedissen Maschinen & Anlagen GMBH*, 206 F.3d 411, 417 n. 4 (4th Cir.2000). After the court decides that a particular dispute is covered by an arbitration clause, the court may not proceed to consider the merits of the case and must immediately send the case to arbitration. *Adkins v. Labor Ready, Inc.*, 185 F.Supp.2d 628, 634 (S.D.W.Va.2001) (citing *AT & T Techs., Inc. v. CWA*, 475 U.S. 643, 649 (1986)). "[W]e leave all questions concerning the scope of an arbitration agreement to the arbitrator, 'unless it can be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute.'" *Winston–Salem Mailers Union 133, CWA v. Media Gen. Operations, Inc.*, 55 Fed. Appx. 128, 133 (4th Cir.2003) (citing *AT & T Techs.*, 475 U.S. at 650).

In the parties' briefing, they assert that the motion should be construed as a Rule 12(b)(3) motion because "an arbitration clause [is] 'a specialized kind of forum-selection clause.'" (ECF Nos. 3 at 6 (quoting *Aggarao v. MOL Ship Mgmt. Co.*, 675 F.3d 355, 365–66 n.9 (4th Cir. 2012)); 9 at 3.) However, Rule 12(b)(3) allows for dismissal only when a venue is "wrong" or "improper." *Atlantic Marine Const. Co., Inc. v. United States Dist. Court for W. Dist. Of Tex.*, 571 U.S. 49, 55 (2013). "Whether venue is 'wrong' or 'improper' depends exclusively on whether the court in which the case was brought satisfies the requirements of federal venue laws, and those provisions say nothing about a forum-selection clause." *Id.*

4

As indicated in footnote one above, the Court is construing this motion as one for summary judgment, governed by Rule 56 of the Federal Rules of Civil Procedure. "'[M]otions to compel arbitration exist in the netherworld between a motion to dismiss and a motion for summary judgment,' and '[w]hether the motion should be treated as a motion to dismiss or a motion for summary judgment turns on whether the court must consider documents outside the pleadings.'" *Dowdy v. Santander Consumer USA, Inc.*, No. SAG-19-01386, 2019 WL 5455554, at *1 (D. Md. 2019) (quoting *PC Const. Co. v. City of Sailsbury*, 871 F. Supp. 2d 475, 477–78 (D. Md. 2012)); *see also Iraq Middle Mkt. Dev. Found v. Harmoosh*, 848 F.3d 235, 241–42 (4th Cir. 2017) (adopting the district court's use of the summary judgment standard); *Waugh v. 590 North Fork Road Operations LLC*, No. 3:18-cv-0941, 2018 WL 5815565, at *2 (S.D. W. Va. Nov. 6, 2018) (applying a summary judgment standard to a motion to compel arbitration); *Denver Global Prods., Inc. v. Leon*, No. 5:17-cv-00102-MOC-DSC, 2018 WL 3428149, at *1 (W.D.N.C. July 16, 2019) (citing *Chorley v. Enters., Inc. v. Dickey's Barbecue Rests,, Inc.*, 807 F.3d 553, 564 (4th Cir. 2015)) (recognizing that "[r]elevant factual disputes concerning a motion to compel arbitration generally should be evaluated similarly to a motion for summary judgment."); *Cherdak v. ACT, Inc.*, 437 F. Supp. 3d 442, 454 (D. Md. 2020) (holding that "[t]reating a motion to compel as a motion for summary judgment is proper where the formation or validity of the arbitration agreement is in dispute.") Since both parties premise their arguments on documents outside the pleadings, including the document designating Bonnie Schulz as medical surrogate, this Court will consider documents outside the pleadings and the summary judgment standard will be used.

Summary judgment is proper where the pleadings, depositions, and affidavits in the record show that there is "no genuine issue as to any material fact and the movant is entitled to judgment

5

as a matter of law." Fed. R. Civ. Pr. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In resolving motions for summary judgment, the moving party bears the burden of showing that there is no genuine issue of material fact, and that it is entitled to judgment as a matter of law. *Celotex Corp.*, 477 U.S. at 322–23. "Facts are 'material' when they might affect the outcome of the case, and a 'genuine issue' exists where the evidence would allow a reasonable jury to return a verdict for the nonmoving party." *News & Observer Publ'g Co. v. Raleigh-Durham Airport Auth.*, 597 F.3d 570, 576 (4th Cir. 2010). The Court must view the evidence "in the light most favorable to the [party opposing summary judgment]." *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) ("The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."). Rule 56 "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322.[2]

### III. DISCUSSION

This case turns on whether Ms. Schulz, as James Duncan's medical surrogate, had the authority to bind James Duncan to arbitration. The West Virginia Supreme Court recognizes challenges to the enforceability of arbitration agreements "'under state common law principles that are not specific to arbitration and pre-empted by the [Federal Arbitration Act].'" *See Brown v.*

---

[2] At this time, no more discovery is needed on the particular issue Defendants raise because, for the reasons that follow, Defendants' argument fails as a matter of law, and Defendants do not necessarily disagree. (*See* ECF No. 11 at 2.)

*Genesis Healthcare Corp.*, 729 S.E.2d 217, 222 (W. Va. 2013) (quoting *Marmet Health Care Center, Inc. v. Brown*, 565 U.S. 530, 534 (2012)).

In *State ex rel. AMFM, LLC v. King*, 740 S.E.2d 66 (W. Va. 2013), the West Virginia Supreme Court, on facts similar to those here, held that an arbitration agreement between a patient and health care facility was unenforceable because the patient's medical surrogate signed the arbitration agreement on the patient's behalf. *King*, 740 S.E.2d at 70, 72. In reaching this conclusion, the Court held that the West Virginia Health Care Decisions Act, W. Va. Code § 16-30-1 *et seq.*, "authorizes a health care surrogate to make health care decisions on behalf of the incapacitated person for whom the surrogate has been appointed." *Id.* at 74. The Court then went on to define what constitutes a "health care decision." *Id.* at 74–75. Ultimately, the Court held that the medical surrogate, who was the patient's daughter, lacked authority to bind the patient to arbitration because the arbitration agreement was not a precondition of the patient's admission to the facility. *Id.* at 72, 75. Since the arbitration agreement was optional and not required to receive nursing home services, the surrogate's signing of the agreement was "not a health care decision under the West Virginia Health Care Decision Act." *Id.*

Like in *King*, Defendants assert that James Duncan's daughter, Ms. Schulz, signed the arbitration agreement on his behalf while she was acting as his medical surrogate. (ECF No. 3 at 2, ¶¶ 2–3.) Also, like in *King*, the arbitration agreement in this case specifically states that "signing this Agreement is *not a condition* of admission to or continued residence in the Facility." (ECF No. 2-2 at 3 (emphasis added).) Since Ms. Schulz's signing of the arbitration agreement was not a precondition of James Duncan's admission to Defendants' facility, it was not a "health care decision." Therefore, Ms. Schulz lacked the authority to bind James Duncan to the agreement,

7

rendering the agreement unenforceable. *See Waugh*, 2018 WL 5815565 (denying defendant's motion to dismiss and compel arbitration on facts nearly identical to those here).

Individuals have a constitutional right to a trial by jury and a right to access courts. *King*, 740 S.E.2d at 71. Ms. Schulz, acting as medical surrogate for James Duncan, lacked the authority to waive James Duncan's rights and enter into an arbitration agreement on his behalf. *Id.*

In Defendants' reply, they pivot from asserting Ms. Schulz had the power to bind James Duncan as his medical surrogate to her having the power to bind him because she was his power of attorney. (ECF No. 11 at 2–3.) Specifically, Defendants assert that they "have reason to believe that . . . [Ms. Schulz] was [James Duncan's] power of attorney in addition to being appointed his medical surrogate." (*Id.* at 2 (citing ECF No. 11-1).) However, whether Defendants "have reason to believe" that Ms. Schulz was James Duncan's power of attorney is not the same as whether Ms. Schulz was in fact James Duncan's power of attorney, and Defendants do not even argue as such.[3]

### IV. CONCLUSION

For these reasons, the Court **DENIES WITHOUT PREJUDICE** Defendants' pending motion to compel arbitration and motion to dismiss. (ECF No. 2.)

**IT IS SO ORDERED**.

The Court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and any unrepresented party.

ENTER: May 23, 2024

---

[3] The parties are currently in the discovery phase, and Defendants have the option of filing a new motion if evidence is retrieved proving that Ms. Schulz had power of attorney for James Duncan.

_____
THOMAS E. JOHNSTON, CHIEF JUDGE